```
UNITED STATES DISTRICT COURT                      C/M
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
 LORENZO BOYD,                                              :   **MEMORANDUM DECISION**
                                                            :   **AND ORDER**
                              Petitioner,                   :
                                                            :   13 Civ. 5572 (BMC)
             - against -                                    :
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :
                              Respondent.                   :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Petitioner seeks habeas corpus relief under 28 U.S.C. § 2255, vacating his conviction on one count of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), for which I sentenced him to 96 months' custody (below the Guidelines' range of 120 months) and three years' supervised release. His claims are: (1) "ineffective assistance of counsel" because petitioner was "heavily sedated with prescribed psycotropic [sic] drugs which impaired his ability … to confer with counsel and make appropriate decisions concerning the trial;" and (2) he had a "biased jury pool" because "everyone in the room was of European descent." His petition is time barred and without merit, and his claims are accordingly denied.

## BACKGROUND

The procedural facts surrounding petitioner's conviction after a jury trial are set forth in the Second Circuit's affirmance of the conviction. United States v. Boyd, 398 F. App'x 649 (2d Cir. 2010), cert. denied, 131 S.Ct. 2444 (2011). To summarize the relevant points, petitioner was represented before me by three different attorneys. His first attorney moved to suppress the firearm seized at the time of his arrest, and the Magistrate Judge to whom the motion was

referred recommended denial.  Petitioner then requested and received a new attorney, and upon receiving advice from that attorney, he pled guilty pursuant to a plea agreement, and after accepting the plea, I denied his motion to suppress as moot.  During his plea allocution, he specifically acknowledged under oath that he had possession of a firearm at the time he was arrested.  "I was going to the store and I took it out, I was looking for my girlfriend so I took it outside.  I went around the corner from where I live at, on my way back that's when they popped me."  After his guilty plea, he then became dissatisfied with that attorney, and I appointed someone else.  Petitioner then moved to withdraw his guilty plea, which I granted, and the matter went to trial.

At trial, the Government offered testimony from the two police officers who had observed petitioner with a sawed-off rifle protruding from his sleeve.  When they made eye contact with him, he immediately started running to the apartment in which he was residing.  The officers arrested him just after he reached the apartment and recovered from his person a fully loaded, operable rifle with the serial number obliterated.

Petitioner testified very coherently on his own behalf (I specifically recall his testimony, and thinking that he had a surprisingly "professorial" affect in explaining his version of the facts), asserting that he never had any possession of a weapon, thus suggesting that the police were framing him, or that the weapon that they had recovered belonged to the person in whose residence he was staying.  He acknowledged that he was on his way to purchase some crack cocaine at the time he was arrested and had seen the officers on his way out.  When he returned with the crack cocaine, he entered the apartment and the police came through the door.  He said the police thoroughly searched the apartment and if they found a weapon, it was not his, and he had no knowledge of it.  The jury rejected his testimony and found him guilty.

As a result of his prior (and subsequently withdrawn) guilty plea, as well as his testimony at trial, I was aware (as was the jury, as he had testified briefly about it) that petitioner had a history of mental illness, particularly paranoid schizophrenia and depression, for which he was receiving medication after his arrest. He remained in custody after his arrest. Following his conviction before the jury, this was confirmed by the presentence investigation report, which showed a long history of mental illness. The PSR also noted that since his arrest for the instant crime, petitioner stated that he had "been feeling well and had no suicidality nor depression." The report also noted that his "mood, sleep, and appetite were all normal. The defendant works as an orderly in his unit, and has had no psychotic symptoms/homicidal ideations since his incarceration."

To make sure I had as complete an understanding of petitioner's history and characteristics at sentencing as possible, I *sua sponte* directed a psychological evaluation, which was performed by Dr. Sanford Drob, prior to sentencing. Like petitioner's previous health professionals, Dr. Drob found severe mental impairments, although he thought it might be more likely that petitioner had long-standing Complex Post-Traumatic Stress Disorder than his earlier diagnoses of paranoid schizophrenia. He further found that since petitioner had been taken into custody and was receiving regular medication, his condition had "somewhat improved," both as a result of that medication and "a certain reflectiveness that often comes with age as well as a greater interest and capacity to relate to others." Nevertheless, Dr. Drob's view was that petitioner was in continuing need of monitoring and treatment for mental illness and substance abuse, as well as occupational rehabilitation. Although the severity of petitioner's impairment is apparent from Dr. Drob's report, there was no suggestion that petitioner was incapable of assisting in his own defense.

3

As I noted at sentencing, one aspect of either petitioner's character or his mental illness or both is his ability to engage in deceptive conduct to manipulate people. I noted his prior conviction for obtaining money by entering homes through the impersonation of a television technician, and that notwithstanding a full confession at the time of his guilty plea allocation, he went on to testify at trial with a completely different story. He did so in a fairly convincing way, even though the jury did not accept his testimony. Indeed, at sentencing, when I asked him to explain the contradiction, he maintained that it was his guilty plea that had been fabricated, not his trial testimony, although he gave me no reason why he would fabricate the story he had told me at his plea allocution.

Based on all of the factors under 18 U.S.C. § 3553(a), I sentenced petitioner as noted above, with drug abuse treatment recommended while in custody and mental health treatment as a condition of supervised release. Petitioner appealed, raising an issue, among others, relating to his Guidelines calculation, and also contending that I had failed to rule on his motion to suppress. The Court of Appeals rejected both arguments, noting, as to the latter argument, that I had denied the suppression motion as moot once he pled guilty (after the Magistrate Judge had recommended denial on the merits), and that once the guilty plea was withdrawn, it was incumbent on petitioner to seek its reinstatement if he wanted to pursue it, which he had not done. The Circuit also predicted that even if I had ruled on the merits of the suppression motion, "the District Court, after a *de novo* review, would have allowed the evidence to be admitted, finding that the officers had probable cause to arrest Boyd and entered Boyd's apartment without a warrant due to exigent circumstances." Boyd, 398 F. App'x at 651.

Thirty months after the Supreme Court's denial of petitioner's application for a writ of certiorari (May 16, 2011), he commenced the instant proceeding under 28 U.S.C. § 2255. By

Order to Show Cause entered October 18, 2013, I directed him to show why his petition should not be dismissed as time-barred. This Order advised petitioner that he was beyond the one-year time limitation for filing this petition, but that mental illness can constitute the kind of extraordinary circumstances that could toll the statutory period. The Order noted the statement in the petition that "I was taking a number of psychotropic medicines and was unable to understand the charges or to cooperate in my defense. I have been under such medications since April 2007 til 2012." The Order concluded that this statement was insufficient to warrant equitable tolling, but it directed petitioner to submit medical records and a more detailed explanation of when he became disabled and when he stopped being disabled.

Petitioner responded in two ways. First, he submitted a large volume of medical records for his period in custody, both pre-dating and post-dating his sentence, up through February, 2012.[1] Second, petitioner submitted an affidavit, in which he offered some detail of his condition during his time in custody. The affidavit lists the ten medications that he could recall taking during custody, some psychotropic and some others such as ibuprofen, and their effects on him. He asserts that his medication regime "prevented me from filing this proceeding for the period from October 22, 2011 to the date I filed this petition [October 7, 2013]." He summarizes his mental state during this period as follows:

> The above meds made me alienated and made me drowsy all the time. Except when I was awoken by hunger or my cellmate to eat, I slept. The meds caused me to endure the exact conditions they were supposed to treat. There was no time during this period of heavy medication that I could think. When I was awake, I heard voices and they blotted out all other thoughts. The voices I heard told me things and made suggestions which were not normal. It's very hard to describe but it was so impossible to think about anything, let alone legal complexities, I just shut down mentally to escape the noise in my head.

---

[1] These records were received in Chambers. I am hereby directing the Clerk to file them on the docket under seal, finding that petitioner's privacy interests outweigh the qualified right of public access to these documents.

> The meds caused me to develop a nervous condition which the prison doctors told me is called Tardive Dyskinesia.[2]

Petitioner noted that he was due to be released on October 23, 2013, and would like to obtain a lawyer specializing in representing those with mental health problems.[3]

## DISCUSSION

### I

"Section 2255 provides that a prisoner sentenced by a federal court may move to have that sentence vacated, set aside or corrected if he or she claims that the court, in sentencing him or her, violated the Constitution or the laws of the United States, improperly exercised jurisdiction, or sentenced him or her beyond the maximum time authorized by law." Thai v. United States, 391 F.3d 491, 493 (2d Cir. 2004). However, "[b]ecause collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction" through a proceeding under §2255 than by direct appeal. Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010) (citations and quotations omitted). The statute thus allows relief "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468 (1962)). For each ground for relief, a petition under section 2255 must set

---
[2] Petitioner did not submit complete medical records, and there is no reference in those that he did submit to Tardive Dyskinesia. In any event, it does not appear that this condition is related to petitioner's schizophrenia or PTSD or that it affects his ability to comprehend or assist in his own defense. See www.tardivedyskinesia.com (last visited 11/15/2013).

[3] The Bureau of Prisons' website shows a scheduled release date of March 26, 2014, but it may be that petitioner is eligible for early release. He appears to reside presently in a residential reentry center.

forth "specific facts which he is in a position to establish by competent evidence." LoCascio v. United States, 395 F.3d 51, 57 (2d Cir. 2005).

Section 2255(f) sets forth the statute of limitations to file for relief. A movant must file within one year from the latest of four benchmark dates: (1) when the judgment of conviction becomes final; (2) when a government-created impediment to making such a motion is removed; (3) when the right asserted is recognized initially by the Supreme Court, if it has been made available retroactively to cases on collateral review; or (4) when the facts supporting a claim could have been discovered through the exercise of due diligence. See 28 U.S.C. § 2255(f).

In certain situations, petitioners are entitled to equitable tolling of the limitations deadline on a Section 2255 petition. See Smith v. McGinnis, 208 F.3d 13 (2d Cir. 2000). A petitioner must satisfy two elements to benefit from equitable tolling. First, he must show that he exercised "reasonable diligence" during the limitations period, and second, that "extraordinary circumstances" precluded him from timely filing. Hizbullahankhamon v. Walker, 255 F.3d 65,75 (2d Cir. 2001). Mental illness may constitute extraordinary circumstances so as to toll the statute of limitations in some cases. Bolarinwa v. Williams, 593 F.3d 226 (2d Cir. 2010).

Petitioner's mental status is relevant both to the issue of equitable tolling and the merits of his first claim, although the issues relate to different times periods. To demonstrate grounds for equitable tolling, petitioner must show that after the judgment against him became final on May 16, 2011 (when the Supreme Court denied certiorari), he lacked the mental capacity to file this proceeding during at least eighteen of the thirty months that ensued between the denial of his certiorari petition and the date he commenced this action; that is, there was not an aggregate of twelve months (whether consecutive or not) during the thirty month period during which he had the mental capacity to file this proceeding.

His mental condition also relates to the merits of his first claim – that he was unable to assist in his defense at trial and/or his sentencing.[4] As to that issue, petitioner would have to show mental incapacity during that part of the case.

Because equitable tolling presents a threshold issue, I will consider his mental capacity in these two time periods in reverse chronological order.

## II

Petitioner's affidavit, quoted above, constitutes *prima facie* evidence that he was too mentally disabled to file this proceeding post-sentencing. However, the affidavit is directly contradicted by all of the medical records during that period, as well as petitioner's own statements.

In his affidavit in response to the Order to Show Cause, he averred that his medications "prevented me from filing this proceeding for the period from October 22, 2011 to the date I filed this petition," i.e., October 7, 2013. It is apparent that even on petitioner's most favorable dates, he had five chargeable months against his one-year period – from the Supreme Court's denial of his petition for a writ of certiorari on May 16, 2011 to his offered date of October 22, 2011.

More importantly, there is no support at all in the medical records that he has submitted for the self-assessment in his affidavit. Contrary to his claim in this proceeding, the most notable aspect from these interviews is that petitioner would frequently refuse to take his medications, not that he became disabled as a result of taking them. Petitioner had regular contact, at least once a month and usually more, with a prison psychologist, medical doctor, or physician's

---

[4] Petitioner refers to this as "ineffective assistance of counsel," but it is clear that that is not what he is talking about.

8

assistant. Much of the product of these interviews is petitioner's self-reporting. The records are too voluminous to discuss all of them in detail, but the virtually all show that he had the capacity to commence this proceeding. Typical of them is an interview conducted on August 13, 2012:

> Reports doing very well, and announced that he has not been taking his medication this month. …
>
> Affect was bright and broad. His cognition was goal-directed, sequential, and logical. He was fully oriented. Reports sleep and appetite to be healthy, although he admits not eating as much in an attempt to lose some unwanted weight. … Denies any SI/AI[5] recent or current. Says the last time he heard voices was five years ago and adds that it was at that time that he was last deeply depressed. And that the only reason he was initially placed on the psychometric medications was after having taken these previously, and that health services continued these upon his arrival as a result.

Similarly, his clinical contact note of June 4, 2012 stated:

> Remains largely compliant with his Prozac, Cogentin, and Zyprexa. Discussed the benefit of increasing compliance to nearly 100%. Affect was normal and broad. While he was initially hoping for a transfer to a low security institution, this was rejected but he insists that he is much happier staying here as he knows the routine and has made many associations within the GP. The crux of his day is said to be working (CCS orderly) and taking GED classes. Sleep and appetite are described to be well within normal ranges. Says the medication regime has been helpful in managing the symptoms of depression and mood-related psychotic sx's. Says he hasn't felt depressed for a very long time, and has not been experiencing AH/VH[6] at all. He denied any SI/AI.

These same kinds of entries were made all the way through 2011. See e.g. Clinical Contact note of March 11, 2011 ("He was fully oriented and engaged in meaningful and fluid conversation regarding his mental health and plans for when he releases. We were able to discuss his involvement in GED classes at this time and his goals to perhaps become involved in VT [vocational training] after that is completed.").

---

[5] "SI" most likely refers to suicidal ideation. "AI" may mean aggressive ideation, homicidal or otherwise.

[6] Auditory hallucinations/visual hallucinations.

When a habeas corpus petitioner puts in an affidavit that is directly contrary to regularly kept documentary evidence, the Court need not credit the affidavit. See Florez v. United States, No. 07–CV–4965, 2009 WL 2228121 at *9 (E.D.N.Y. July 24, 2009) ("Rather than challenging his conviction, petitioner's work records reinforce the testimonial and documentary evidence against him."); Percan v. United States, 294 F. Supp. 2d 505 (S.D.N.Y. 2003) ("When considering Percan's unsubstantiated statements on this point, and Percan's other assertions in his motion that are directly contradicted by the record . . . the Court finds not credible Percan's claim."). I have no doubt that petitioner does in fact suffer from serious mental illness. But based on the medical records, nothing prevented petitioner from filing this proceeding for any substantial period within the 30 months after the Supreme Court denied his certiorari petition. If he had any periods of incapacity, they were fleeting. I therefore reject his claim of equitable tolling, and find that the petition is untimely.

**III**

Even if the petition was not time-barred, it would have to be dismissed on the merits.

As to his first claim, I recognize that if petitioner was not competent to assist in his own defense, grounds would exist for habeas corpus relief. "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Drope v. Missouri, 420 U.S. 162, 171, 95 S.Ct. 896 (1975). "Indeed, 'conviction of an accused person while he is legally incompetent violates due process.'" United States v. Auen, 846 F.2d 872, 877 (2d Cir. 1988) (quoting Pate v. Robinson, 383 U.S. 375, 378, 86 S.Ct. 836 (1966)).

10

However, I was very familiar with petitioner's mental status at the time of sentencing, having directed his examination by Dr. Drob and having reviewed his extensive report. There can be no doubt that notwithstanding his mental illness, petitioner was very capable of assisting with his own defense at trial and at sentencing. His testimony at trial was fully lucid, and that lucidity continued in the manner in which he expressed himself at sentencing. As noted above, there was nothing in Dr. Drob's report to indicate a lack of ability to participate in his defense, and everything I observed belied any such suggestion. "It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial." United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986).

It is of some significance that in his affidavit, petitioner states that it was only in "early 2013" that he stopped taking his medications and "realized that I was innocent and had been unfairly put in prison." But this cannot be right. Petitioner was obviously aware of his alleged innocence while his criminal case was pending before me – after all, it was on the basis of that assertion that he withdrew his guilty plea and testified as to his innocence at trial. He also again asserted his innocence at his sentencing hearing. His misstatement in this regard is consistent with my view expressed at sentencing that one of petitioner's adaptations to his mental illness is the ability to use it to achieve short term goals.

All of the evidence shows that he was competent to proceed with trial and sentencing. Based on his medical records and my observations of him in the long course of his criminal case, it is far more likely that, if he has now stopped his medication as he asserts, his impairment is interfering with his present thinking rather than his thinking when he was before me for trial and sentencing.

# IV

Petitioner's second point is that he had a "biased jury pool" because everyone in the room was of "of European descent." The Sixth Amendment has been interpreted to require that a jury be selected from a representative cross-section of the community. See Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692 (1975). This claim would fail for two reasons.

First, the claim has been waived because petitioner neither raised it during jury selection nor on appeal. See Davis v. United States, 411 U.S. 233, 93 S.Ct. 1577 (1973); United States v. Tarascio, 15 F.3d 224 (2d Cir. 1993); Campino v. United States, 968 F.2d 187 (2d Cir. 1992). Where a defendant fails to raise an alleged constitutional violation on direct appeal, he may not raise such a claim on collateral review unless he can show (1) "cause" for his failure to raise the claim on appeal; and (2) actual "prejudice" due to the alleged violation. See Reed v. Farley, 512 U.S. 339, 354, 114 S.Ct. 2291 (1994). The good cause prong requires the movant to show that something "external to the petitioner, something that cannot fairly be attributed to him," resulted in his failure to raise a claim on direct appeal. Coleman v. Thompson, 501 U.S. 722, 753, 111 S.Ct. 2546 (1991). I have rejected petitioner's contention of mental incompetence, and he has offered no other basis for a finding of cause.

Second, petitioner offers no evidence showing that the venire was not representative of a cross-section of the community. To the contrary, the transcript undermines his contention, as it shows his contention that the venire was entirely "of European descent" is in all likelihood wrong. Although the names of the panel members are not conclusive as to national origin, considering that the initial panel seated included Sanchez, Perea, Benjaskullluecha, Wu, Adedeji,

and Wong, petitioner cannot prevail on his unsupported claim that the venire was "of European descent."

Accordingly, his claim is rejected.

V

I have concluded that a further hearing is not necessary in this matter for three reasons. First, as noted, I am very familiar with petitioner's underlying criminal case, his demeanor, and his mental condition. See Puglisi v. United States, 586 F.3d 209, 214 (2d Cir. 2009) ("[W]hen the judge that tried the underlying proceedings also presides over the Section 2255 motion, a less-than-full-fledged evidentiary hearing may permissibly dispose of claims where the credibility assessment would inevitably be adverse to the petitioner."). Second, the documentary evidence that I directed petitioner to file in response to the Order to Show Cause conclusively refutes the claims in his affidavit. See Chang v. United States, 250 F.3d 79 (2d Cir. 2001) (district court may request documentary evidence in lieu of full hearing). Finally, petitioner's claims are simply too vague and conclusory to require further inquiry. See Machibroda v. United States, 368 U.S. 487, 495-96, 82 S.Ct. 510 (1962).

**CONCLUSION**

The petition for a writ of habeas corpus is denied. A certificate of appealability shall not issue. See 28 U.S.C. § 2253(c). Further, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3)

that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal.  See <u>Coppedge v. United States</u>, 369 U.S. 438, 82 S. Ct. 917 (1962).

**SO ORDERED.**

_____
Digitally signed by Brian M. Cogan
U.S.D.J.

Dated: Brooklyn, New York
November 18, 2013